IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHANEA DANIEL,

    *Plaintiff*,

    v.                     Civil Action No. ELH-23-233

HOME BOX OFFICE, INC., *et al.*,

    *Defendants*.

## MEMORANDUM OPINION

This suit is rooted in the television miniseries *We Own This City* (the "Series" or the "Show"), which concerns the now defunct Gun Trace Task Force ("GTTF"), a corrupt unit of the Baltimore Police Department ("BPD"). Shanea Daniel, an African American female exotic dancer with dwarfism, filed suit against defendant Home Box Office, Inc. ("HBO"), the distributor of the Show, alleging that a three-minute scene (the "Scene") falsely implies that she engaged in prostitution with Sergeant Wayne Jenkins, the former leader of the GTTF. *See* ECF 1 ("Complaint"), ¶¶ 3, 34, 44, 51.[1]

---

[1] In addition to HBO, plaintiff sued the following entities: Warner Bros. Discovery, Inc.; WarnerMedia Direct, LLC; WarnerMedia Services, LLC; Home Box Office, Inc.; HBO Service Corporation; Time Warner, Inc.; Warner Communications, Inc.; and AT&T, Inc. *See* ECF 1 at 1–3. However, plaintiff did not effect service on these defendants. *See* Docket. The Court provided several warnings to plaintiff that failure to effect service on these defendants would result in the dismissal of the suit as to them, under Fed. R. Civ. P. 4(m) and Local Rule 103.8. ECF 18 (Order of July 31, 2023); ECF 19 (Order of October 3, 2023). Plaintiff failed to respond. Therefore, by Order of November 1, 2023, the Court dismissed the unserved defendants from the case, without prejudice. ECF 20.

The suit contains three counts, all arising from allegations that HBO falsely implied that plaintiff engaged in prostitution with Jenkins.  *See id.* ¶¶ 19, 30, 45, 53.[2]  In Count 1, plaintiff alleges that HBO defamed her by implying that she engaged in prostitution with Jenkins.  *Id.* at 6–8; *see id.* ¶ 30.  In Count 2, plaintiff alleges a claim of "False Light." *Id.* at 8–9; *see id.* ¶ 45.  And, in Count 3, plaintiff alleges that HBO acted negligently by failing to ensure the accuracy of the depiction of events involving plaintiff.  *Id.* at 9–10; *see id.* ¶¶ 51, 53.  Daniel seeks $3,000,000 in compensatory damages, $10,000,000 in punitive damages, attorney's fees, and interest.  *Id.* at 10.

HBO has moved to dismiss plaintiff's claims for failure to state a claim.  ECF 8.  The motion is supported by a memorandum. ECF 8-1 (collectively, the "Motion").  HBO also moved for leave to file a physical exhibit of a Universal Serial Bus ("USB") drive containing a copy of the Series. ECF 9 ("Motion to File"). Plaintiff did not respond to the Motion to File.  *See* Docket.  But, she opposes the Motion (ECF 16, the "Opposition"), supported by exhibits.  ECF 16-2 to ECF 16-5.  Defendant replied. ECF 17 ("Reply").

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion to File.  And, I shall grant the Motion in part and deny the Motion in part.

---

[2] Jurisdiction is premised on diversity of citizenship, pursuant to 28 U.S.C. § 1332.  ECF 1, ¶ 1.  HBO is headquartered in New York and incorporated in Delaware, *id.* ¶ 9, and plaintiff is domiciled in Maryland.  *Id.* ¶ 3.

## I.      Factual and Procedural Background[3]

The GTTF "consist[ed] of several [BPD] Officers."  ECF 1, ¶ 14.  One was Jenkins, "who . . . commit[ted] numerous public integrity crimes from approximately 2015 to 2017."  *Id.*

Plaintiff makes reference to a six-count Superseding Indictment ("Indictment") filed in the District of Maryland on June 22, 2017, which charged Jenkins and two other officers, *inter alia*, with Hobbs Act Robbery under 18 U.S.C. § 1951 and violations of the Racketeer Influenced and Corrupt Organizations Act.  *Id.* ¶ 15; *see United States v. Wayne Jenkins et al.*, GLR-17-0106, ECF 137.[4]  Among other things, the Indictment alleged that in the spring of 2015, Jenkins and two codefendants interrupted a significant marijuana sale and confiscated approximately $20,000 to $25,000 in cash, which Jenkins and his codefendants then divided among themselves.  *See id.* ¶¶ 15–17. According to the Indictment, the officers then drove to a strip club in Baltimore County, where Jenkins robbed a stripper and subsequently fled with his codefendants.  *Id.* ¶ 18.

Plaintiff alleges that she was the "stripper mentioned in the" Indictment.  ECF 1, ¶ 15. According to plaintiff, she "had been working at the Millstream Inn Gentlemen's Club in the spring

---

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  The Court may also consider some of the exhibits submitted by the parties. Throughout the Memorandum Opinion, the Court provides citations to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

[4] The original Indictment was filed on February 23, 2017.  *United States v. Wayne Jenkins et al.*, GLR-17-0106, ECF 1.  It named a total of seven defendants, including Jenkins.  *Id.*  The criminal case was assigned to Judge Catherine Blake.  ECF 170.  The case as to Jenkins has since been reassigned to Judge George Russell.  *See* Docket, 10/18/2022.

I may take judicial notice of documents filed in the criminal proceedings against Jenkins and his codefendants.  *See Parikh v. Frosh*, PX-22-110, 2023 WL 131043, at *5 (D. Md. Jan. 9, 2023) ("'[A] federal district court may take judicial notice of documents from state court proceedings and other matters of public record in conjunction with a Rule 12(b)(6) motion without converting it to a motion for summary judgment.'") (quoting *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244, 246 n. 2 (D. Md. 2013)).

of 2015." *Id.* ¶ 4.   Moreover, she asserts that she was "one of only two known exotic dancers diagnosed with dwarfism who performed in the greater Baltimore area from 2015 to 2017." *Id.* Indeed, plaintiff posits: "There is no other person who possesses the identifying characteristics of the corresponding character in the Show." *Id.* ¶ 23.

Plaintiff recounts that in 2021, Random House, a division of Penguin Random House LLC, New York, published investigative reporter Justin Fenton's book, *We Own This City*, which described the crimes committed by Jenkins and GTTF. *Id.* ¶ 17.   The book did not mention that Jenkins had robbed an exotic dancer. *Id.*

HBO released the Series on April 25, 2022. *Id.* ¶ 18.   Although the Series is based on Fenton's book, it also includes depictions of events not discussed in the book, such as Jenkins's interaction with plaintiff. *Id.*; *see also id.* ¶ 23.   According to plaintiff, the Scene, which is in Episode Four of the Series, "clearly depicts" Daniel. *Id.* ¶ 23.

The Scene begins as law enforcement officials interview one of Jenkins's codefendants, Officer Maurice Ward, about Jenkins's various crimes. [5]   Ward mentions Jenkins's interaction with Daniel.   At the same time, Jenkins, Ward, and another of Jenkins's codefendants, Officer Marcus Taylor, are shown seated together in a strip club.   Jenkins is receiving a lap dance from an unnamed dancer.

The Scene contains the following depictions and dialogue:

Ward: This shit is crazy.
Taylor: You know what's crazy? You really like that steak right?
Jenkins (to Unnamed Dancer): I like how you move. Damn bro, where'd you get that at? Huh? Ain't you done girl? You from Dundalk? You smell good for a white girl.  (laughs)
Taylor: That's my fucking shit.

[5] The Scene begins at about 14:26 in Episode Four.  All timestamps provided by the Court are approximate.  The Court's description and the transcript are based on its review of the Scene.

The officers notice Daniel performing on stage, and comment on her appearance and performance.  The following dialogue is relevant:

> Jenkins: Holy mother fucking shit.
> Taylor: Oh. Oh, my lord.
> Dancer 1: You're on fire, baby.
> Jenkins. Whoo! That's fire! I don't believe it. She's fucking gorgeous.
> Taylor: Holy shit!
> Ward: Ohhhhhh.
> Jenkins (to Unnamed Dancer): Okay. Okay girl Goddamn! Hey this is the greatest mother fucking place on earth! This is fucking — look at her! Hey, hey, hey, hey, hey listen, listen, listen. Do me a favor, sweetheart. Go talk to her. Get her ass off this stage and tell her to come meet me in VIP all right? Yeah I got you boo. Shit, you know I always come correct! Fucking stick your fucking hand out like that. Go get her!
>
> Jenkins slaps the Unnamed Dancer on the buttocks.
>
> Jenkins: Boom!
> Unnamed Dancer: Hey! Fuck you, man!
> Jenkins: Just go fucking get her.
> Unnamed Patron: Oh she twerking.

As the Unnamed Dancer moves toward the stage, Jenkins talks to Ward and Taylor, as follows:

> Jenkins: Let me tell you something, I'm a fuck her. I swear to God. Yes I am. Watch me, dead ass. I'm a fuck her. Watch me!
> Taylor: Calm your ass down.
> Jenkins: I swear to God, my whole life I wanna fuck [indecipherable].
> Taylor: Jenkins, fucking how?
> Jenkins: What do you mean how? I'm a fucking handle my business baby, what y'all gonna fucking do? You don't think I will?
> Taylor: Hell no, this liquor got you horny.
> Ward: Here she comes, here she comes.
> Jenkins (to Daniel):  What's up you gorgeous thing! Goddamn it's an honor to meet you sweet thing. What's going on?
> Daniel: I got you. You're mine.
> Taylor: You're a nasty motherfucker.
> Ward: He dead ass.
> Jenkins: Don't hate me 'cause you ain't me baby.
> Jenkins (to an Unnamed Bouncer): Hey, put it up there, that's there, my man.

Jenkins enters the VIP area with Daniel.

> Taylor: Seventy-five percent of that body weight is ass.
> Ward: He doing his thing, man.
> Taylor: He goin' too hard.
> Ward: How was your steak, man? Mine was fucking slapping. Thank you. Thank you.
> Taylor: Variety in everything is the spice of life. Bro that's some sick shit bro.
> Ward: Let your man live.
> Taylor: What the fuck he about to do with that?
> Ward: Jenkins crazy man, but let him live.
> Taylor: Bro, bro.
> Ward: Why is that sick? You was just saying how she was twerking.

Approximately fourteen seconds after Jenkins enters the VIP room, Jenkins hurriedly exits and approaches Ward and Taylor.  The following dialogue ensues:

> Jenkins: Hey, hey, hey, hey yo, yo yo. We gotta bounce!
> Ward: That was quick.
> Jenkins: Shut the fuck up man, when I say we gotta bounce, we gotta bounce. Yo them steaks good? I'ma take this motherfucker. Lemme take the fucking beer too, let's go.

Jenkins, Ward, and Taylor rush to exit the club, which is identified by name on the exterior as the "Millstream Inn."

> Jenkins: What's going on? Watch the fuck out.
> Unnamed Dancer: Hey!
> Unnamed Bouncer: Hold up!

Jenkins, Ward, and Taylor head towards a vehicle.  The following dialogue is pertinent:

> Jenkins: Come on man, let's get the fuck out of here. Let's go! Come on, we gotta go.
> Taylor: Come on man.
> Ward: Yo, what the. . .? Jenkins, what the fuck did you [inaudible] Hot damn man.
> Taylor: Get in the fucking car already.

The officers enter the vehicle and drive away from the club, with the dialogue that follows:

Jenkins. Let's go!

Taylor: What the fuck just happened, yo?

Ward: Wayne, man we wasn't even in there an hour.

Jenkins: Hey hey look look, that little fucking mini-me motherfucker was on top of me for like five seconds. I couldn't fit inside of her. So I knew that shit wasn't gonna happen so I just dumped the runt on the ground and I . . .

Ward: She put it on you, didn't she?

Jenkins: Nah man.

Ward: She put it on you, didn't she?

Jenkins: I tell you what she did.

Ward: She put all that ass on him!

Jenkins: I'll tell you what happened motherfucker. Hey I grabbed her fucking money and bailed the fuck out that's what happened.

Taylor: You kidding me?

Jenkins: Check this shit out. Yeah you fucking heard me. Hey look, it's like twice as much as I fucking gave her. Hee-haw motherfucker.

Ward: You robbed the midget stripper?

Jenkins: Come on, don't put it like that, man.

Taylor: That's not cool. That's not cool, Sarge!

Plaintiff alleges that the Scene, which is approximately three minutes long and ends at 17:25, falsely implies that she engaged in prostitution. ECF 1, ¶ 21. Although plaintiff acknowledges that she gave a lap dance to Jenkins, she alleges that she "never had any form of sexual contact with" him. *Id.* ¶¶ 22, 31–32.

According to plaintiff, the false implication that she engaged in prostitution with Jenkins harmed her reputation and caused her to "suffer[] embarrassment and other emotional distress from her efforts to correct the record with her friends and family." *Id.* ¶¶ 24, 26. In addition, plaintiff alleges that HBO's "implication of sexual contact between [her] and . . . Jenkins has caused significant damage to the goodwill and reputation of . . . Daniel's business," *id.* ¶ 25, and "has made it more difficult for [her] to book performances." *Id.* ¶ 26.

Additional facts are discussed, *infra*.

## II.       Standard of Review

### A.

A defendant may test the legal sufficiency of a plaintiff's complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570*; see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at

317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts]

in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

When ruling on a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of*

*the complaint.' " Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g., De Simone v. VSL Pharmaceuticals*, 36 F.4th 518, 531 (4th Cir. 2022) (recognizing that, generally, new arguments cannot be raised in a reply brief); *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

**B.**

Both parties have filed exhibits with their respective submissions.  In support of her Opposition, plaintiff filed a law review article discussing libel in fiction (ECF 16-2); an article published by the "Freedom Forum Institute," also discussing libel in fiction (ECF 16-3); a purported transcript of the Scene (ECF 16-4); and definitions of the terms "put it on me" and "put it in me" from the Urban Dictionary website (ECF 16-5).

With respect to the purported transcript, defendant states, ECF 17 at 11 n.6:

> The Opposition attaches . . . what purports to be a transcript of the Scene from a third-party website ("rev.com") (ECF 16-4).  That unauthenticated transcript contains numerous clear errors (including by misattributing who is speaking at various points, and the fact that the transcript lists "Shanea Daniel" as the name of

the dancer even though the character has no name in the Series).   In any event, the outcome of this motion would be the same regardless of the transcript version, and the Court should review the Series, including the Scene, for itself.

In support of its Motion, defendant moved to file a copy of the Show, which has been provided to the Court on a USB drive.   ECF 9.   Plaintiff did not respond to the Motion to File.   *See* Docket.   Nor does she oppose defendant's request.   She states, ECF 16 at 23: "Plaintiff encourages this Honorable Court to watch the whole series.   HBO has facilitated as much by filing its physical exhibit."

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"   *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).   *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).   In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"   *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro*, 930 F.3d at 248; *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  "[F]or [such a] document to be considered, the plaintiff's claim must turn on, or otherwise be based on, the contents of the document." *Brentzel v. Fairfax Transfer and Storage, Inc.*, 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (citing *Goines*, 822 F.3d at 166).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167.  "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," that is, if they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Fed. R. Evid. 201(a) distinguishes "adjudicative facts," which are subject to the Rule, from "legislative facts," which are not. *See* Fed. R. Evid. 201, Note to Subdivision (a). "[A]djudicative facts are those to which the law is applied in the process of adjudication. They are the facts that normally go to the jury in a jury case." *Id.* (citation and internal quotation marks omitted). "Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." *Id.*

Under the principles described above, I may consider the copy of the Series submitted by defendant. *See* ECF 9. Plaintiff does not dispute that the copy of the Show defendant provided to the Court is authentic. And, plaintiff urges the Court to consider it. ECF 16 at 23. Moreover, the Show is integral to the Complaint because plaintiff's claims "turn on" and are "otherwise . . . based on" its content. *Brentzel*, 2021 WL 6138286, at *2. Therefore, I shall grant defendant's Motion to File. *See* ECF 9.

As noted, plaintiff filed as attachments to her Opposition two articles from legal publications discussing libel in fiction (ECF 16-2; ECF 16-3); a purported transcript of the Scene (16-4); and entries for the terms "put it on me" and "put it in me" from the Urban Dictionary website (ECF 16-5).

14

The articles filed by plaintiff as "exhibits" are, in essence, legal authorities.  Plaintiff appears to submit them to substantiate her theory of defamation, not to establish any fact upon which her claim for relief depends.  The usual manner of directing the Court's attention to a legal authority is to provide a citation to that authority.  However, instead of citing the two articles in question, plaintiff appended copies of them to her Opposition.  In my view, it is appropriate to evaluate these sources as if plaintiff had cited them in the usual way.  That is, I shall disregard the *copies* of the sources that plaintiff provided to the Court.  Instead, I shall consider myself at liberty to locate the sources in a reliable legal database, as I would any other authority recommended to the Court by a party.

As noted, defendant claims in its Reply that the transcript provided by plaintiff contains "numerous clear errors," such as "the fact that the transcript lists 'Shanea Daniel' as the name of the dancer even though the character has no name in the Series."  ECF 17 at 11 n.6.  Elsewhere in the Reply, defendant states: "Although Plaintiff is not personally identified in the Scene, for purposes of this Motion, Defendant is not arguing that the dancer in the Scene could not be understood to be Plaintiff."  *Id.* at 3.  Therefore, the fact that the transcript provided by plaintiff identifies the dancer as plaintiff is not material to the Court's assessment of the Motion.

Nevertheless, I cannot accept the purported transcript of the Scene as an authoritative statement of what was said during the Scene.  *See* ECF 16-4.  The transcript—as distinguished from the Scene it purports to describe—is not integral to plaintiff's Complaint.  Nor is "Rev.com," the service that apparently generated this transcript, a "source[] whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see* ECF 16-4.  However, the transcript has been an aid to the Court in its own review of the Scene and in preparing the relevant dialogue for inclusion in

this Memorandum Opinion.  But, the Court considers the transcript only insofar as the transcript is consistent with what the Court has seen and heard during its own review of the Scene.

As to the entries for the terms "put it on me" and "put it in me" from the Urban Dictionary website, I decline to consider them.  ECF 16-5.  Certainly, these entries are not "integral" to plaintiff's Complaint.  Nor is the Urban Dictionary a "source[] whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see Vampire Fam. Brands, LLC v. MPL Brands, Inc.*, DMG-20-9482, 2021 WL 4134841, at *2 (C.D. Cal. Aug. 6, 2021) (declining to take judicial notice of definitions from Urban Dictionary in motion to dismiss because the entries "can be modified by any individual"); *Stay You, LLC v. H&M Hennes & Mauritz, LP*, KMW-20-1396, 2023 WL 3775282, at *3 (S.D.N.Y. June 2, 2023) (granting motion in limine to exclude Urban Dictionary definitions because the site has "few content guidelines for users . . . a perfunctory review process . . . [and a] single word can have hundreds of definitions"); *Pom Wonderful LLC v. Hubbard*, MMM-13-6917, 2014 WL 12561630, at *8 (C.D. Cal. 2014), *rev'd on other grounds*, 775 F.3d 1118 (9th Cir. 2014) (noting that Urban Dictionary "allows users to publish their own definitions of words with limited editorial oversight").

### III.    Discussion

### A.   Defamation (Count 1)

### 1.

The parties assume, without discussion, that Maryland law applies to plaintiff's defamation claim.  *See* ECF 8-1 at 15; ECF 16 at 5–6; ECF 17 at 2.  As noted, the Court's jurisdiction in this case rests on diversity of citizenship of the parties.  *See* 28 U.S.C. § 1332.  In a diversity case, the court "must apply the forum state's choice-of-law rules to determine the governing substantive law."  *Towers Watson & Co. v. Nat. Union Fire Ins. Co.*, 67 F.4th 648, 653 (4th Cir. 2023); *see*

*also Dominion Fin. Servs., LLC v. Pavlovsky*, ___ F.Supp.3d ___, JKB-22-0705, 2023 WL 3550011, at * 6 (D. Md. May 18, 2023); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). The forum state here is Maryland.

Under Maryland choice-of-law doctrine, the "law of the place of injury" applies "to all matters of substantive law." *Lewis v. Waletzky*, 422 Md. 647, 657, 31 A.3d 123, 129, 130 (2011). "In defamation suits, the place of harm is traditionally the location where the defamatory statement was published." *Driver Opportunity Partners I, LP v. First United Corp.*, RDB-20-2575, 2021 WL 82864, at *8 (D. Md. Jan. 8, 2021) (citing *Abadian v. Lee*, 117 F. Supp. 2d 481, 485 (D. Md. 2000). However, when "the defamatory statements are published in multiple states," courts consider "the state of plaintiff's domicile, the state of plaintiff's principal activity to which the alleged defamation relates, and the state where plaintiff suffered the greatest amount of harm." *Driver*, 2021 WL 82864, at *8 (internal quotation marks and citation omitted). "[G]enerally speaking, the plaintiff's state of residence bears the most significant relationship to the incident and parties because that is where the plaintiff's reputation suffers the most." *Alston v. Ross*, PX-21-0141, 2021 WL 2895835, at *3 (D. Md. July 9, 2021) (internal quotation marks and citation omitted).

Plaintiff alleges that HBO "published the [defamatory] statement to a worldwide audience." ECF 1, ¶ 35. Therefore, in determining which state's law applies, I consider "the state of plaintiff's domicile, the state of plaintiff's principal activity to which the alleged defamation relates, and the state where plaintiff suffered the greatest amount of harm." *Driver*, 2021 WL 82864, at *8. Plaintiff alleges that she "is an adult resident and citizen of Baltimore City, Maryland," *id.* ¶ 3, who "performed in the greater Baltimore area from 2015 to 2017." *Id.* ¶ 4. Thus, according to the allegations, Maryland is the state of plaintiff's domicile, the state of the

activity to which the defamation relates, and, presumably, "the state where plaintiff suffered the greatest amount of harm." *Driver*, 2021 WL 82864, at *8. As a result, I conclude that Maryland's law of defamation applies to plaintiff's claim.

**2.**

"Under Maryland law, a properly pleaded defamation claim is accompanied by specific facts establishing the following four elements: '(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Baker-Proctor v. PNC Bank, N.A.*, DKC-21-3299, 2023 WL 1801932, at *2 (D. Md. Feb. 7, 2023) (quoting *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012)).

Under Maryland law, a "statement is defamatory if it 'tends to expose a person to public scorn, hatred, contempt[,] or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'" *Behram v. Adventist Health Care, Inc.*, 2023 WL 4011686, at *20 (Md. App. Ct. June 15, 2023) (quoting *Seley-Radtke v. Hosmane*, 450 Md. 468, 482–83, 149 A.3d 573, 581 (2016)). "The threshold question of whether a publication is . . . reasonably capable of a defamatory interpretation is for the court . . . ." *Batson v. Shiflett*, 325 Md. 684, 723, 602 A.2d 1191, 1210 (1992) (citing *Hohman v. A.S. Abell Co.*, 44 Md. App. 193, 197, 407 A.2d 794, 797 (1979)). However, "[i]f words are capable of more than one meaning or a defamatory meaning could be inferred, then the meaning to be attributed to them is a question of fact for the jury." *Batson*, 325 Md. at 723, 602 A.2d at 1210–11 (citing *Hohman*, 44 Md. App. at 198, 407 A.2d at 797).

"Maryland has retained the common law distinction between defamation *per quod* and defamation *per se*." *Sullivan v. City of Frederick*, JKB-17-1881, 2018 WL 337759, at *8 (D. Md.

18

Jan. 9, 2018) (citing *Ind. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441, 966 A.2d 432, 448 (2009)), *aff'd*, 738 F.App'x 198 (4th Cir. 2018). "A statement that is defamatory *per se* is one for which the 'words themselves impute the defamatory character,' such that the plaintiff need not plead additional facts demonstrating their defamatory nature." *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 365–66 (D. Md. 2017) (quoting *Metromedia, Inc. v. Hillman*, 285 Md. 161, 172, 400 A.2d 1117, 1123 (1979)). "In the case of defamation per quod, extrinsic facts must be alleged in the complaint to establish the defamatory character of the words or conduct." *Ind. Newspapers*, 407 Md. at 441–42, 966 A.2d at 448 (citing *M & S Furniture Sales Co., Inc. v. Edward J. Bartolo Corp.*, 249 Md. 540, 544, 241 A.2d 126, 128 (1968)).

"The types of statements typically considered defamatory *per se* fall within discrete categories." *Solomon Found. v. Christian Fin. Res., Inc.*, JRR-22-993, 2023 WL 3058321, at *4 (D. Md. Apr. 24, 2023). In particular, "a 'statement [that] disparages the business reputation of a plaintiff is one of the categories traditionally considered to be defamation *per se*.'" *Id.* (quoting *Southern Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 843 (D. Md. 2005)). Moreover, "accusing someone of criminal behavior is actionable as defamation *per se*." *Solomon Found.*, 2023 WL 3058321, at *4 (citing *Shapiro v. Massengill*, 105 Md. App. 743, 775, 661 A.2d 202, 218 (1995)) (Hollander, J.).

"Under the second element, a 'false' statement is one 'that is not substantially correct.'" *Piscatelli*, 424 Md. at 306, 35 A.2d at 1147 (quoting *Batson*, 325 Md. at 726, 602 A.2d at 1213). "Put another way, a statement is not considered false unless it would have different effect on the mind of the reader [or viewer] from that which the pleaded truth would have produced." *Batson*, 325 Md. at 727, 602 A.2d at 1212 (citation and internal quotation marks omitted).

With respect to the third element, fault, a plaintiff who is not a public official must "show[] that, at a minimum, the party making the false statement acted negligently." *Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d 217, 241 (D. Md. 2023) (citing *Hearst Corp. v. Hughes*, 297 Md. 112, 122, 466 A.2d 486, 491 (1983)).  So, "[i]n the context of defamation cases involving private plaintiffs, to adequately show negligence, plaintiffs must allege facts sufficient to show that the defendant 'failed to act as a reasonable person under like circumstances in making the false and defamatory statements.'" *Finley Alexander Wealth Mgmt., LLC v. M&O Marketing, Inc.*, GJH-19-1312, 2021 WL 1215769, at *13 (D. Md. Mar. 31, 2021) (quoting *Hawk v. Ruby*, No. 03-C-15-005270, 2019 WL 4860760, at *9 (Md. Ct. Spec. App. Oct. 1, 2019)).

In contrast, "when . . . the plaintiff is a public official, the standard is actual malice." *Rorie*, 653 F. Supp. 3d at 241 (citing *Capital-Gazette Newspapers, Inc. v. Stack*, 293 Md. 528, 538, 445 A.2d 1038, 1043 (1982); *Kapiloff v. Dunn*, 27 Md. App. 514, 524, 343 A.2d 251, 258 (1975)).  In other words, the plaintiff must establish that the defendant acted with actual malice.  "Actual malice is established by showing that the speaker made the statement with actual knowledge that it was false or with reckless disregard for its truth." *Rorie*, 653 F. Supp. 3d at 241 (citing *Hearst Corp.*, 297 Md. at 120, 446 A.2d at 490).

"The standard for establishing harm," the fourth element of a defamation claim, "is different depending on whether the statement was defamatory *per se* or defamatory *per quod*." *Rorie*, 653 F. Supp. 3d at 242.  "[I]n cases in which the statement [is] defamatory *per se* and was made with actual malice, harm may be presumed." *Doe*, 274 F. Supp. 3d at 366 (citing *Hearst Corp.*, 297 Md. at 125, 446 A.2d at 493; *Shapiro*, 105 Md. App. at 773, 661 A.2d at 217).  However, in cases in which the statement is defamatory *per quod*, or defamatory *per se* but made

without actual malice, a plaintiff must prove actual damages.  *See Shapiro*, 105 Md. App. at 774;

661 A.2d at 217–18; *Rorie*, 653 F. Supp. 3d at 242 (citations omitted).

**3.**

In the Motion, defendant urges dismissal of plaintiff's defamation claim on two grounds.

ECF 8-1 at 19–22.   First, defendant invokes a purported rule of federal constitutional law, to the

effect that a statement that does not assert an "actual fact" cannot give rise to liability for

defamation.  *Id.* at 16 (citing *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998));

*see* ECF 8-1 at 19–21.   According to defendant, the Scene is not actionable because it does not

state an "actual fact" about plaintiff.   ECF 8-1 at 21.   Defendant explains, *id.* at 20 (emphasis in

original):

> The alleged defamation claim is premised entirely **on lines spoken by Wayne
> Jenkins only to his buddies**—and it is a central tenet of the entire Series that
> Jenkins is a serial liar and shameless braggart. His words carry no presumption of
> truth, and no reasonable viewer would accept Jenkins' account of *any* interaction
> as a statement of "actual fact" unless they can confirm it with their own eyes.  And
> here, nothing actually happens onscreen to suggest anything more than a (very
> brief) lap dance from the dancer in the VIP room . . . .

Second, defendant argues that the Scene neither implies that plaintiff engaged in

prostitution with Jenkins nor suggests that HBO intended or endorsed such an implication.  *Id.* at

21–22.   Defendant recounts that after opening the dancer exits the stage, Jenkins tells her it's an

"honor" to meet her.   ECF 8-1 at 13.   The dancer takes Jenkins's hand and leads him toward the

private rooms.   *Id.*   Jenkins "high-fives a security guard."   According to HBO, no other

conversation occurs between the dancer and Jenkins.  *Id.*   Moreover, no sexual activity is depicted.

HBO states, *id.*: "Instead, only eighteen seconds after opening the door to the private room, Jenkins

comes bursting out fully dressed—not even adjusting any item of clothing—and insists that the

group leave right away."

According to defendant, "it is a matter of constitutional law that where a plaintiff alleges a claim for defamation by implication, the work in question must not only 'reasonably . . . impart the false innuendo," but also 'affirmatively suggest that the author intends or endorses the inference.'" *Id.* at 22 (quoting *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092–93 (4th Cir. 1993)). Defendant asserts that "nothing in the Series affirmatively suggests that HBO intended to convey th[e] implication" that plaintiff engaged in prostitution with Jenkins. ECF 8-1 at 22. Instead, defendant claims that "th[e] Scene is set up like numerous others throughout the Series—many of which occur in the very same episode—where Jenkins shamelessly lies and boasts, while the audience watches a different reality unfold onscreen than the one he is describing." *Id.*

HBO's argument concerning plaintiff's defamation claim also contains a subsection with the heading: "Courts Provide Broad Protection for Docudramas." *Id.* at 17. Citing several cases in which courts have considered allegedly defamatory docudramas, defendant maintains that reasonable viewers generally understand that docudramas are not accurate as to every particular. *See id.* at 17–19. According to defendant, "[w]hen analyzing defamation claims involving scripted docudramas like this one, courts assume viewers are 'sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts.'" *Id.* at 18 (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1554–55 (9th Cir. 1995)). In defendant's view, "[t]hat is particularly true here, where the work in question contains a disclaimer acknowledging that the work contains elements of fictionalization and dramatization." ECF 8-1 at 19 n.3. Defendant also asserts, more categorically, that "lines of dialogue spoken by characters in a docudrama 'should not be interpreted as the actual statements of the speaker to whom they are attributed.'" *Id.* at 19 (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 512–13 (1991)).

Nonetheless, HBO acknowledges that the status of the Series as a docudrama—a dramatized depiction of real events—does not, in itself, disqualify the Series from serving as the basis of a defamation claim. ECF 8-1 at 19 ("[T]here is not a wholesale 'docudrama exception' to defamation . . . ."). Therefore, defendant's contention that "Courts Provide Broad Protection for Docudramas" does not appear to advance an independent ground for dismissing the defamation claim. Instead, the argument in this subsection appears to complement defendant's assertions in the other subsections that dismissal is warranted because the Scene does not purport to state an "actual fact," *id.* at 19, or reasonably imply that plaintiff engaged in prostitution. *Id.* at 21.

In her Opposition, plaintiff argues, first, that the elements of fiction present in the Series do not immunize its creators from liability for defamation. ECF 16 at 5. According to plaintiff, "[t]he Maryland Court of Special Appeals specifically recognized that defamation could arise from a work of fiction in" *Publish Am., LLP v. Stern*, 216 Md. App. 82, 99, 84 A.3d 237, 247 (2014). ECF 16 at 10.[6] As plaintiff observes, *id.* at 10–11, in *Stern*, 216 Md. App. at 99, 84 A.3d at 247, the Maryland Court of Special Appeals said:

> A libel[] may be published of an actual person by a story or essay, novel, play or moving picture that is intended to deal only with fictitious characters if the characters or plot bear such a resemblance to actual persons or events as to make it reasonable for its readers or audience to understand that a particular character is intended to portray that person. . . . The fact that the author or producer states that his work is exclusively one of fiction and in no sense applicable to living persons is not decisive if readers actually and reasonably understand otherwise.

---

[6] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the State's highest court, the Maryland Court of Appeals, to the Supreme Court of Maryland. And, the voters also approved changing the name of the Maryland Court of Special Appeals, the State's intermediate appellate court, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://perma.cc/DH62-7N7M. However, to avoid confusion, I will refer to the Maryland courts by the names that were in effect when the cited cases were decided.

Plaintiff asserts that the allegations in the Complaint leave "no doubt that the little-person, exotic dancer in the Series is Shanea Daniel." ECF 16 at 11.

Second, plaintiff argues that, contrary to HBO's assertion that courts afford "broad protection" to docudramas, ECF 8-1 at 17, the law recognizes "no special dispensation [from defamation liability] for docudramas." ECF 16 at 14. According to plaintiff, in each of the cases cited by defendant to illustrate the supposedly "broad protection" courts afford to docudramas, the defamation claim at issue failed because it did not satisfy "one of the specific elements" of defamation, not because it concerned a work that was "part of the docudrama genre." *Id.* at 12. Therefore, in plaintiff's view, "HBO has merely pulled together a list of cases where [defamation claims based on] docudramas happened to fail" for reasons unrelated to the fact that that the works at issue were docudramas. *Id.* at 14.

Third, plaintiff maintains that, with respect to the first element of her defamation claim, defamatory meaning, the Scene "involves statements that a reasonable finder of fact could easily interpret as derogatory. *Id.* at 16. In particular, according to plaintiff, "[t]he Series explicitly states that Wayne Jenkins attempted to have sex with Shanea Daniel, necessarily implying that she engaged in prostitution, engaged in voluntary sexual contact with a man she met just minutes before, or was sexually assaulted by Sgt. Jenkins." *Id.* Citing the Maryland Court of Appeals's statement in *Batson*, 325 Md. at 723, 602 A.2d at 1210–11, that it "is a question of fact for the jury" whether words "capable of a defamatory meaning" are, in fact, defamatory, plaintiff asserts: "[T]his Court does not have the power to dismiss Plaintiff's defamation claims as a matter of law and must submit the question of whether HBO's publication was derogatory to a jury." ECF 16 at 16.

Fourth, plaintiff argues that Jenkins's statement that he had sexual contact with the character representing plaintiff, when considered in the context of the Scene, must be understood as a statement of actual fact. *See id.* at 17–23.  Plaintiff acknowledges that "the character based on Wayne Jenkins is certainly written to be disreputable." *Id.* at 17.  Nonetheless, according to plaintiff, "one of the main themes of the Series" is that Jenkins cultivated a "circle of trust" with other officers complicit in his wrongdoing. *Id.*  Plaintiff suggests that, because the character identified as Jenkins made the allegedly defamatory statement to officers in this "circle of trust," that statement can be reasonably considered one of actual fact, notwithstanding Jenkins's general tendency to mendacity. *See id.* at 18.

Plaintiff also objects to HBO's purported "characteriz[ation]" of the defamation "as limited to a few lines" spoken by Jenkins. *Id.* at 19.  In plaintiff's view, the defamatory implication arises from the Scene considered in its totality. *Id.*  Therefore, according to plaintiff, the Court's assessment of whether the Scene implies as an "actual fact" that plaintiff engaged in prostitution with Jenkins should not be limited to the words spoken by Jenkins. *Id.*  Instead, the Court must account, *inter alia*, for the fact that the Scene depicts plaintiff "actually leading Sgt. Jenkins into the VIP room" where his encounter with plaintiff occurred. *Id.*

In its Reply (ECF 17), HBO reiterates that dismissal is warranted because "the hyperbolic boasts by" Jenkins, "a character known to be a serial liar[,] cannot reasonably be interpreted as a factually accurate account of what happened with the dancer offscreen." *Id.* at 3.  HBO offers several reasons why Jenkins's "boasts" about sexual contact with plaintiff should be considered "facially implausible." *Id.* at 9.

For example, HBO contends that Jenkins's statement that he ended the sexual encounter with plaintiff because he could not "fit inside" her is facially implausible, because it depends on

the "physiologically false" premise that "a normal-size[d] man cannot have sexual relations with a little person." *Id.* at 8.  In addition, in HBO's view, "Jenkins bursting out of the room less than 20 seconds after entering it, fully dressed, can[not] be squared with a sexual encounter." *Id.* at 9. Moreover, according to HBO, Jenkins admits that no sexual encounter occurred when, after he has fled from the club, he states to the other officers: "I'll tell you happened . . .  I grabbed her . . . money and I bailed . . . out." *Id.* at 10.

HBO also renews its argument that it cannot be considered to have "'intend[ed] or endorse[ed]' the various [defamatory] implications Plaintiff claims [the boasts] convey."  ECF 17 at 3–4.  As noted, HBO asserts that, "[w]here a plaintiff alleges a claim for defamation by implication" from a depiction of true facts, "the work in question must not only 'reasonably . . . impart the false innuendo,' but also 'affirmatively suggest that the author intends or endorses the inference.'"  *Id.* at 13 (quoting *Chapin*, 993 F.3d at 1092–93).  According to HBO, plaintiff concedes that all events depicted in the Scene, except for Jenkins's statements that he had sexual contact with plaintiff, actually occurred.  *Id.* at 13.  Therefore, HBO claims that the defamatory implication "arise[s]," if at all, "from the combination of those true facts and the 'five seconds' of hyperbole" spoken by Jenkins.  *Id.* at 14.  In HBO's view, plaintiff's allegations provide no basis for concluding that, by depicting the events in the Scene, HBO "intend[ed] or endorse[d] the inference" that plaintiff was engaged in prostitution with Jenkins.  *Id.* at 13–14; *see Chapin*, 993 F.3d at 1092–93.

Finally, according to HBO, it does not advocate "some kind of 'special protection' or 'special dispensation' for docudramas," as plaintiff maintains.  ECF 17 at 7 (quoting ECF 16 at 12, 14).  Instead, HBO's claim is simply that, "under the First Amendment and the governing case law, no matter the type of work, in every defamation case, the nature and 'general tenor' of that

work is *always* relevant to a court's assessment of whether it reasonably conveys the meaning alleged." ECF 17 at 6.

### 4.

As noted, "[u]nder Maryland law, a properly pleaded defamation claim is accompanied by specific facts establishing the following four elements: '(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Baker-Proctor*, 2023 WL 1801932, at *2 (quoting *Piscatelli*, 424 Md. at 306, 35 A.3d at 1147).

Defendant offers two grounds for concluding that plaintiff did not plausibly allege the first element of defamation, "that the defendant made a defamatory statement to a third person." *Baker-Proctor*, 2023 WL 1801932, at *2 (internal quotation marks and citation omitted). First, defendant claims that Jenkins's statements cannot reasonably be considered statements of "actual fact." ECF 8-1 at 19–21; ECF 17 at 8–13. Second, defendant claims that there is no basis for concluding that HBO intended or endorsed the inference that plaintiff engaged in sexual contact with Jenkins. ECF 8-1 at 21–22; ECF 17 at 13–14. HBO does not appear to contest that plaintiff has adequately alleged the remaining three elements of defamation: falsity, fault, and harm. *See Baker-Proctor*, 2023 WL 1801932, at *2.

I do not agree with HBO that the statements alleged by plaintiff to be suggestive of sexual contact with Jenkins—*e.g.,* Jenkins's statement that he "couldn't fit inside of her"—cannot reasonably be considered statements of actual fact. At this stage of the litigation, it is not for the Court to decide the best or most likely interpretation of these statements. Instead, the Court's task is to determine whether the statements can "reasonably be interpreted as stating actual facts." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 2 (1990).

In my view, a reasonable factfinder could conclude that Jenkins, despite his tendency to exaggerate or lie, was truthfully recounting his encounter with plaintiff when he made the statements in question.  Jenkins and the character depicting plaintiff are shown heading to a room together after Jenkins repeatedly states his intention to "fuck" this character. After Jenkins leaves the room, he tells his companions that that he "couldn't fit inside of" the character portraying plaintiff.  A reasonable factfinder could conclude from these statements that Jenkins sought to engage in sex with plaintiff; that plaintiff was willing to engage in sex with Jenkins; and that some form of sexual contact between them occurred.

To be sure, defendant offers several reasons why, in its view, Jenkins's statements should not be regarded as statements of actual fact.  For example, defendant suggests that Jenkins's statement that he "couldn't fit inside of her" cannot reasonably be considered a true description of events, because it is "physiologically false" that "a normal-size[d] man cannot have sexual relations with a little person."  ECF 17 at 8.  Moreover, according to defendant, it is implausible that Jenkins would have left the room fully clothed after having a sexual encounter with plaintiff. *Id.* at 9.  These supposed inconsistencies might affect a factfinder's view of what is the *best* interpretation of Jenkins's statements.  However, they do not establish as a matter of law that the *only* reasonable interpretation of the statements is the one urged by defendant, namely, that the statements were untruthful boasts.

In support of its argument that Jenkins's statements do not concern actual facts, defendant cites *John E. Reid & Assocs.*, 2020 WL 1330657 (N.D. Ill. 2020), and *Brodeur v. Atlas Ent., Inc.*, 248 Cal. App. 4th 665 (2016).  ECF 8-1 at 19–20.  These cases do not compel the conclusion advocated by HBO.

In *Reid*, 2020 WL 1330657, the plaintiff, a company that "owne[d] . . . the trademarked method for interviewing criminal suspects called the Reid Technique," alleged that it was defamed by a scene in the television series *When They See Us*, in which a prosecutor states that the "Reid Technique has been universally rejected."  *Id.* at *1.  The court ruled that this statement was not defamatory because it could not be considered a statement of actual fact.  *Id.*  The court explained: "To ensure that public debate does not suffer for lack of 'imaginative expression' and 'rhetorical hyperbole,' the First Amendment protects from defamation liability any statement that 'cannot reasonably be interpreted as stating actual facts.'" *Id.* at *7 (quoting *Milkovich*, 497 U.S. at 2). "'[L]oose language' and 'undefined slogans'—like saying something is 'unfair' or 'fascist,' or calling someone a 'traitor,' or accusing someone of blackmail—do not necessarily amount to falsifications of fact."  *Reid*, 2020 WL 1330657, at *7 (quoting *Old Dominion Branch No. 496, Nat Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 284 (1974)) (citation omitted). According to the court, "[w]hen the prosecutor [says] . . . that the Reid Technique has been 'universally rejected,' he is using the kind of loose, hyperbolic rhetoric that is a protected part of the nation's discourse."  *Reid*, 2020 WL 1330657, at *7 (citation omitted). In other words, the statement at issue in *Reid* was nothing more than "non-verifiable hyperbole." *Id.* at *8.

The same cannot be said of Jenkins's statements that plaintiff "was on top of [him] for like five seconds" and that he "couldn't fit inside of her."  These words, perhaps colorful, could nonetheless be understood to mean that the two attempted to have sex and had some form of sexual contact.  And, in contrast to terms such as "unfair" or "fascist," Jenkins's statements cannot be characterized as value judgments.  *See Reid*, 2020 WL 1330657, at *7.

In *Brodeur*, 248 Cal. App. 4th 665, the plaintiff, Paul Brodeur, was "a well-known author in the environmental field" whose work has described the health dangers posed by microwave

ovens. *Id.* at 669. He alleged in a California state court that he was defamed by a scene in the film *American Hustle* in which a character named Rosalyn attributes to Brodeur the view that microwaves "take all the nutrition out of . . . food." *Id.* at 670. The court determined that "Rosalyn's comment in the microwave oven scene . . . is not reasonably susceptible of a defamatory meaning" under California law. *Id.* at 680. According to the court, "the general tenor of American Hustle, the entirely farcical nature of the 'science oven' scene, and the ditzy nature of the character uttering the allegedly defamatory statement, all indicate that an audience would not expect anything Rosalyn says to reflect objective fact." *Id.* at 681.

In this case, the Show is a docudrama depicting real events involving a rogue police unit in a generally serious tone. It is certainly not a farce. Nor is the Scene, in particular, a farce. And, although Jenkins as depicted in the Series is boastful and given to exaggeration, I cannot say "that an audience would not expect anything [he] says to reflect objective fact"—especially when what Jenkins says is consistent with other elements of the Scene that are clearly intended to be factual. *See Brodeur*, 248 Cal. App. 4th at 681. In short, the "entirely farcical" scene considered in *Brodeur* bears little resemblance to the Scene at issue here. *See id.* For that reason, *Brodeur* is not a reliable guide to my interpretation of Jenkins's remarks or the Scene more generally.

In sum, I conclude that Jenkins's statements suggesting that he engaged in sexual contact with plaintiff can be reasonably considered statements of actual fact. Therefore, defendant's first proposed ground for dismissal of the defamation claim is unavailing.

I turn to defendant's second proposed ground for dismissal: that the Scene does not reasonably imply that Jenkins engaged in sexual contact with plaintiff and, even if the Scene did so imply, that HBO did not intend or endorse such an implication. ECF 8-1 at 21–22; ECF 17 at 13–14.

In my view, a reasonable factfinder could conclude that the Scene implies that Jenkins engaged in prostitution with plaintiff.  As the scene begins, Jenkins repeatedly states his intention to "fuck" the character allegedly portraying plaintiff.  Then, plaintiff is shown entering a room with Jenkins.  After Jenkins leaves the room and flees the club, he states to his companions: "[T]hat little fucking mini-me motherfucker was on top of me for like five seconds. I couldn't fit inside of her. So I knew that shit wasn't gonna happen so I just dumped the runt on the ground . . . ."  Jenkins also states:  "I grabbed her fucking money and bailed the fuck out . . . Hey look, it's like twice as much as I fucking gave her."  A reasonable factfinder could readily conclude on the basis of these statements that Jenkins had some form of sexual contact with plaintiff in exchange for money.

HBO asserts that, even if the Scene does reasonably imply prostitution on the part of plaintiff, HBO cannot be liable for this defamatory implication because, under *Chapin*, 993 F.2d at 1092–93, nothing in the Scene "'affirmatively suggest[s] that [HBO] intends or endorses th[at] inference.'"  ECF 8-1 at 22 (quoting *Chapin*, 993 F.2d at 1092–93).  The rule from *Chapin* that defendant invokes provides, more fully, 993 F.2d at 1092 (emphasis added) (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)):

> [B]ecause the [C]onstitution provides a sanctuary for truth,[] a libel-by-implication plaintiff must make an especially rigorous showing *where the expressed facts are literally true*.  The language must not only be read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.

In *Chapin*, the plaintiffs operated a charity that sent packages of snack food, purchased with donated money, to American soldiers in Saudi Arabia.  *Id.* at 1091.  After a newspaper article reported, *inter alia*, that the wholesale cost of these packages was substantially less than the price charged to donors, the plaintiffs sued for defamation.  *Id.*  They alleged "that the reporting of these true facts" about the significant markup charged to donors was "intended to convey the false impression that [the plaintiffs] lined their pockets," that is, that they embezzled some of the

donated money.  *Id.* at 1095.  The Fourth Circuit disagreed.  *Id.*  In the Court's view, "[t]he article simply invite[d] inquiry about the mark-up—but it did not "intend[] or endorse[]" the implication that the plaintiff embezzled donated money.  *Id.*

Unlike the plaintiff in *Chapin*, plaintiff in this case does not allege that the defamatory meaning of the Scene arises from "literally true" depictions or statements of fact.  To be sure, plaintiff acknowledges that several elements of the Scene are true depictions of the events in question.  For example, plaintiff did dance at the Millstream Inn; plaintiff did enter a "VIP room" with Jenkins; and Jenkins did rob plaintiff.  ECF 16 at 19.  Nonetheless, plaintiff asserts that Jenkins's statements that he wanted to "fuck" the character depicting plaintiff and that he "couldn't fit inside of her" were "embellish[ments]," ECF 1, ¶ 21, intended "to sensationalize the story and enhance the entertainment value of the Series."  ECF 16 at 23.

To "embellish" a story is to "heighten [it] with fictitious additions."  *Embellish*, Oxford English Dictionary, https://doi.org/10.1093/OED/7537505685 (last visited Nov. 30, 2023). Therefore, I understand plaintiff to allege that Jenkins's purportedly defamatory statements were "fictitious additions" to an otherwise substantially true depiction of real events.

In my view, the alleged presence in the Scene of allegedly defamatory "fictitious additions" removes plaintiff's claim of defamation by implication from the ambit of *Chapin*.  HBO does not provide viewers with an entirely factual depiction of the events and then "simply invite[]" the viewers to wonder about what happened offscreen.  *Chapin*, 993 F.2d at 1095.  Instead, according to the Complaint, HBO adds to the otherwise factual Scene certain fictitious statements that "invite" one conclusion in particular about what happened between Jenkins and plaintiff:  that plaintiff had some form of sexual contact with Jenkins in exchange for money.

In sum, I conclude that the Scene could be reasonably interpreted to imply that plaintiff had sexual contact with Jenkins in exchange for money.  Further, I conclude that, because the alleged defamatory implication arises largely from allegedly fictitious statements made by Jenkins, *Chapin* provides no basis for concluding that HBO neither intended nor endorsed the defamatory implication plaintiff alleges.

**5.**

Having determined that defendant's two proposed grounds for dismissal of the defamation claim are unavailing, I conclude without difficulty that plaintiff has adequately alleged the four elements of defamation under Maryland law.

First, plaintiff has adequately alleged that defendant made a "defamatory statement to a third person." *Baker-Proctor*, 2023 WL 1801932, at *2; *see* ECF 1, ¶¶ 20–24. The "statement" in this case is the Scene in its entirety, which a reasonable factfinder could understand to imply that plaintiff engaged in sexual contact with Jenkins in exchange for money.  To imply that plaintiff engaged in prostitution is defamatory in the relevant sense, because the exchange of sexual contact for money is a crime under Maryland law.  *See* Md. Code (2021 Repl. Vol., 2022 Supp.), § 11-303(a) of the Criminal Law Article.  And, "accusing someone of criminal behavior is actionable as defamation *per se*." *Solomon Found.*, 2023 WL 3058321, at * 4 (citing *Shapiro*, 105 Md. App. at 775, 661 A.2d at 218).  In addition, plaintiff has alleged that defendant made the allegedly defamatory statement "to a third person," *Baker-Proctor*, 2023 WL 1801932, at *2, because, according to the Complaint, "[d]efendant published the false statement to a worldwide audience by releasing the [Series] on the HBO cable Network and HBO-controlled online streaming services." ECF 1, ¶ 35.

Plaintiff has also adequately alleged the second and third elements of defamation, falsity and fault. *See Baker-Proctor*, 2023 WL 1801932, at *2. In particular, plaintiff has alleged "that the statement was false," ECF 1, ¶¶ 19, 25, 32, and that defendant's portrayal of plaintiff was "negligent[]." *Id.* ¶ 33, 39–40.

Finally, plaintiff has adequately alleged that she "suffered harm" from the alleged defamation. *See Baker-Proctor*, 2023 WL 1801932, at *2. According to plaintiff, "[t]he false statement has caused the Plaintiff serious financial harm by diminishing her ability to apply her trade and other job prospects." ECF 1, ¶ 37. In addition, plaintiff alleges that "[t]he false statement has . . . caused [her] serious emotional distress in the form of embarrassment, aggravation, and strained interpersonal relationships." *Id.* ¶ 38.

Therefore, I conclude that plaintiff has stated a claim for defamation.

## B.      False Light (Count 2)

"'[T]o establish a successful claim for false light invasion of privacy, a plaintiff must prove that the defendant [1] gave publicity to a matter concerning another that places the other before the public in a false light, [2] that the false light in which the other person was placed would be highly offensive to a reasonable person, and [3] that 'the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" *Kaur v. Pollack*, SAG-21-00292, 2023 WL 3093405, at *12 (D. Md. Apr. 26, 2023) (quoting *Hill v. Hunt*, CCB-20-3746, 2022 WL 704001, at *6 (D. Md. March 9, 2022)); *see also Watkins v. Carr*, PX-17-0819, 2018 WL 6570686, at *4 (D. Md. Dec. 13, 2018) (quoting *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514, 665 A.2d 297, 318–319 (1995)) (Hollander, J.).

Although defendant claims that plaintiff fails to state a claim for false light invasion of privacy, defendant does not identify which of the three elements of the false light tort plaintiff fails to allege. ECF 8-1 at 22–23. Instead, citing the rule that "a claim for false light . . . may not stand unless the claim also meets the standards for defamation," *Crowley v. Fox Broad. Co.*, 851 F. Supp. 700, 704 (D. Md. 1994), defendant asserts that, "[b]ecause the Complaint fails to state a claim for defamation, the false light claim must also be dismissed." ECF 8-1 at 23. In her Opposition, plaintiff asserts the inverse: that because the Complaint *does* state a claim for defamation, it also states a claim for false light invasion of privacy. ECF 16 at 23–24.

Because the Complaint states a claim for defamation, the rule from *Crowley*, 851 F. Supp. at 704, cited by defendant, does not provide a basis for dismissal of the false light claim. On the other hand, I am not aware of any authority for the proposition urged by plaintiff, *i.e.*, that a complaint stating a claim for defamation necessarily states a claim for false light invasion of privacy.

In any event, I am satisfied that plaintiff has adequately alleged the three elements of the false light tort. In particular, according to the Complaint, plaintiff "gave publicity" to the Scene by "publish[ing] [it] to a worldwide audience by releasing the Show on the HBO cable Network and HBO-controlled online streaming services." ECF 1, ¶ 35. The Scene is alleged to have placed plaintiff in a "false light" by implying that she engaged in prostitution with Jenkins. *Id.* ¶ 45. The Scene's purported implication that plaintiff engaged in prostitution would be "highly offensive to a reasonable person." *Kaur*, 2023 WL 3093405, at *12. Finally, plaintiff has alleged that, "[i]n portraying Plaintiff in a false light, Defendant[] acted in reckless disregard for the truth and with reckless disregard for Plaintiff's privacy interests." ECF 1, ¶ 47.

### C.   Negligence (Count 3)

A "claim for negligent publication" is, "however cast, simply a claim for libel." *Tani v. Wash. Post*, PJM-08-1130, 2009 WL 8652384, at *2 (D. Md. June 18, 2009), *aff'd* 352 F. App'x 792 (4th Cir. 2009) (citing *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)).  That is, under Maryland law, "there is no separate claim for negligent publication" when a plaintiff has already alleged defamation.  *Tani*, 2009 WL 8652384, at *2; *see also D & A Designs LLC v. Fox Television Stations, LLC*, JKB-20-2993, 2021 WL 100803, at * 6 (D. Md. Jan. 12 2021).

"As a matter of judicial economy, courts should dismiss a claim if it is duplicative of another claim in the same suit." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 81 (D. D.C. 2010); *see also W. Veg-Produce, Inc. v. The Lexy Group*, 2018 WL 1804689, at *5 (C.D. Cal. Apr. 16, 2018) ("'A court may dismiss duplicative claims in its discretion.'") (quoting *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18 (D. D.C. 2014)).

Plaintiff's claim is most appropriately addressed as a claim of defamation.  To avoid confusion and the burden associated with duplicate claims, and to avoid the need to pare the claims at a later time, I shall dismiss Count Three, as duplicative.

### IV.   Conclusion

For the reasons given above, I shall grant the Motion in part and deny the Motion in part.  And, I shall grant the Motion to File.  An Order follows, consistent with this Memorandum Opinion.

Date: December 7, 2023                                      _____/s/_____

                                                                      Ellen Lipton Hollander
                                                                      United States District Judge